CASE 79—ACTION BY BARDSTOWN & LOUISVILLE TURNPIKE CO. AGAINST NELSON COUNTY FOR THE PRICE OF THE TURNPIKE IN SAID COUNTY.—FEB. 19.

# Bardstown & Louisville Turnpike Co. v. Nelson County.

### APPEAL FROM NELSON CIRCUIT COURT.

FROM THE JUDGMENT PLAINTIFF APPEALS. REVERSED.

TURNPIKES—PURCHASE BY COUNTY—CONSIDERATION FOR CONTRACT—BURDEN OF PROOF—PAYMENT OF INDEBTEDNESS—BOND ISSUE—EFFECT OF VOTE—ABANDONMENT—JUDGMENT—JURISDICTION OF FISCAL COURT—VALUATION OF PROPERTY—ADMISSIBILITY OF EVIDENCE—INSTRUCTIONS.

Held: 1. Where a turnpike company, suing a county on a contract for the purchase of its road, alleges as the consideration of the agreement the transfer of the road to the county, a plea of no consideration merely raises an issue as to the validity of the vote under which the county contracted, but does not inject an issue of fact, or shift from the plaintiff the burden of proving a consideration.

2. Const., section 157, prohibits a county from incurring a liability beyond the revenue of the current year, unless by two-thirds of the votes cast at an election on that question. Kentucky Statutes 1903, section 4748b, subsec. 9, relative to the purchase of turnpikes by counties, requires that a bond issue to pay therefor shall receive a two-thirds majority at an election on the question. A proposition to buy such a road received 1,370 affirmative votes, 563 being cast against it. A proposition for a bond issue submitted at the same time received only 826 votes, 612 being cast against. HELD, that the county had authority to incur an indebtedness for the purchase of the road beyond the revenue of the current year, but was not authorized to issue and sell bonds therefor.

3. Where the fiscal court of a county submitted a written proposition to a turnpike company to purchase its road, which the company accepted conditionally, but the county rejected the conditions, whereupon the company turned over the road to the county under the original proposition, there was an acceptance of such proposition, binding on the county.

4. Kentucky Statutes, 1903, section 4732, makes it the duty of the fiscal court of a county to take charge of a turnpike which the turnpike company has abandoned for four months; the failure to charge toll to be deemed an abandonment. A county contracted with a turnpike company for the purchase of its road, and the road was turned over to the county, and commissioners appointed in condemnation proceedings, pursuant to contract, to fix its value. Thereafter the county dismissed the proceedings, it having been more than four months since the road was turned over to it. HELD not to constitute an abandonment, within section 4732.

5. Kentucky Statutes, 1903, section 1840, gives county fiscal courts jurisdiction to appropriate county funds, erect and repair public buildings, bridges, etc., regulate and control the fiscal affairs and property of the county, provide for the poor, provide a hospital, take care of the highways, and have jurisdiction of matters relating to taxes, etc. HELD, that such a court had no jurisdiction to try a litigated question as to whether a turnpike company had abandoned its road, and its judgment that the company had done so was void.

6. Kentucky Statutes, 1903, section 4748b, subsec. 13, relative to the purchase of turnpikes by counties, makes it the duty of commissioners appointed under the act to view the road, and require the owners to produce books or other evidence showing receipts and expenditures on the portion sold, and the amount of net earnings of the owners for each year for six years, and to hear

any other evidence conducing to show the value of the property to be taken, and to award the "actual value" of the property. A county contracted with a turnpike company to purchase its road, the value to be fixed in condemnation proceedings instituted by the county. Afterwards the county abandoned such proceedings, and the company sued for the value of the road. HELD that, as the company could not sell to any person except the county, evidence as to the market value of the road was inadmissible, as was also evidence of the market value of the company's stock, and evidence that the marketable character of the road had been destroyed by marauders.

7. The market value of a turnpike is not a criterion of the actual value, which is the measure of the company's recovery in an action against a county under its contract for the purchase thereof.

8. In an action against a county on its contract to purchase a turnpike, an instruction that a vote in the county only authorized it to obtain the road by gift, lease, purchase, or contract, for the purpose of making the road free, is irrelevant.

9. In an action by a turnpike company against a county on its agreement to purchase the company's road, it appeared that for at least six years the company had paid six per cent. dividends on its stock; that the right of way was sixty feet wide; the grade, twenty or twenty-two feet wide; metal, about twenty feet wide. The road was macadam, built of limestone rock so as to make a paving, and covered with broken rock and gravel from four to six inches. The road was built in 1832, and connected the largest city in the State with an enterprising county town; passing through a number of villages and a rich agricultural community. There were two expensive wooden bridges, with substantial stone abutment. The road cost over $200,000. HELD, that instructions permitting the jury to find that the road had no value were erroneous.

OPINION OF THE COURT BY JUDGE O'REAR—REVERSING.

Nelson county by vote in 1897 adopted the provisions of the statute known as the "Free Turnpike Act" (section 4748b, Ky. St., 1903). In the following March the owners of the Bardstown & Louisville Turnpike road and Nelson county (the latter acting through its fiscal court) entered into a contract by which the county was to acquire that

part of appellant's road in Nelson county (about 13 miles), and fixing the compensation to be paid by the county for the use of the road pending the fixing of its value by commissioners or a jury according to the provisions of the statute. The county was permitted to, and did, take charge of the road under that contract, and has continuously since used and maintained it as a public road by virtue of that agreement. On a former appeal (109 Ky., 800, 22 R., 1457, 60 S. W., 862) it was held that the contract in question amounted to an agreement by the turnpike company to sell, and by the fiscal court to buy, the road; that ·the price was left to be determined in the condemnation proceedings which had been instituted by the county; and 'that for the use of the road until the price was thus fixed the county was to pay the turnpike company a sum equal to 6 per cent. per annum on the amount finally fixed as the value and price of the road. Instead of prosecuting the condemnation proceeding already instituted under the statute, and which, as was held on the last appeal, was the one the parties had in contemplation in entering into the contract, the county abandoned it. The commissioners had by their report fixed at the value of the road at $18,356. The condemnation proceeding was dismissed before the commissioners' report was acted on. The county claimed that the statute (subsection 15 of section 4748b) expressly provided that the county might, by paying the expenses incurred, abandon the condemnation proceedings begun by it. While that is true, it does not at all follow that the county could abandon the contract made by it with the road owner. On the former appeal it was held that under the statute the county could acquire the turnpike road by contract, lease, purchase, or by condemnation, and that the paper exhibited' in that suit

was both a contract for purchase and lease. By it the county agreed—so it was held—to pay for the road, as purchase price, the sum to be fixed in the pending condemnation proceeding; and, as the county had wrongfully abandoned and dismissed that condemnation proceeding, an action would lie to recover the value of the road at the time it was taken under the contract; that such was the implied undertaking of that agreement. All the foregoing matters were settled on the former appeal between these two litigants. In this action to recover the value of the road, the county has attempted to relitigate those questions. But that can not be done. They are *res adjudicata*. In addition, the county pleads as a defense that the contract attempted to be made between it and the road company was void because *ultra vires*. There was also a plea that the road had been abandoned by the company for more than six months, and had been taken charge of by the county on that account. There was also a plea of no consideration made by the county. A trial before a jury in the circuit court resulted in a verdict fixing the value of the road, as of the date when taken by the county, at $5,000. This appeal by the road company raises the correctness of the jury's verdict, and of the instructions given the jury by the trial court, as well as its rulings in admitting and rejecting evidence.

Inasmuch as appellant's petition sets out the consideration of the agreement sued on, to it, the transfer of the 13 miles of road to the county by the company, the plea of no consideration simply raises the validity of the vote under which the contract was entered into. As those matters were fully set forth in the petition, their sufficiency was as well presented by the demurrer to the petition as by the plea of no consideration. Under the pleadings as formed, this plea

was really only the pleader's conclusion of the legal effect of the contract, under appellee's version of the vote by which it was authorized. It neither shifted the burden of proof, nor presented an issue of fact in the case. Chaplin & Bloomfield T. P. Road Co. v. Nelson Co., (25 R., 1154) 77 S. W., 377.

Every writing evidencing an indebtedness imports a consideration, under our statute (section 470, Ky. St., 1903). Andrews v. Hayden's Adm'r; 88 Ky., 455, 11 S. W., 428.

A petition upon such writing, where the consideration is not named in it, need not aver the consideration. If the defendant plead no consideration, he would have the burden of proof. But where the writing states its consideration, and the petition also declares upon it, if denied, the burden of proving it is upon the plaintiff. And that is so whether the form of the denial is a traverse or an affirmative denial. The trial court should have awarded the burden in this case to appellant.

When the proposition was submitted to the voters of Nelson county whether they would adopt free turnpike and gravel roads, there was also submitted the question whether they were in favor of issuing bonds to pay for the roads. The first proposition received 1,370 votes in the affirmative, and 563 against it. But on the second proposition there were cast only 826 votes in favor of it, and 612 against it. From this it is argued that no authority was given to incur an indebtedness to be paid out of the revenues of future years; that section 157 of the Constitution prohibits the incurring of a liability by a county beyond the revenues of the year in which it is incurred, unless the proposition is submitted to a vote of the people of the county, and receives in its favor two-thirds of the votes cast on that question.

When the voters of Nelson county, by 1,370 votes to 563, voted to acquire the turnpike roads, that necessarily involved the incurring of such indebtedness as might be required to pay for them. Merely voting for free turnpikes could not make them free. The voters must have known that they would have to pay for the roads, and their value was such that that could not possibly be done out of the revenues of any one year. The vote in favor of free turnpikes would be meaningless unless it was construed to mean that, if it prevailed by the constitutional majority, the necessary indebtedness was also provided for, in order to carry the vote into effect. That is the precise point decided in Whaley v. Commonwealth, for the Use, etc., 110 Ky., 154, 23 R., 1292, 61 S. W., 35. But in this case there is this additional fact, not in the Whaley case: The bond question was also submitted at the same time, and failed of the two-thirds majority required by subsection 9 of section 4748b, Ky. St., 1903. This can not mean, though, that 612 votes could annul 1,370 votes in favor of acquiring all the roads at once. Assuming that these voters knew the effect of their action, and intended it, the situation is this: By more than the constitutional majority the voters of the county decided to acquire all the turnpike roads in the county, and to make them free to all travel; and they, by virtue of that majority, invested the fiscal court with the power to incur an indebtedness beyond the revenues of the current year, in order to carry the will of the voters into effect. But at the same time the voters refused to issue and sell bonds on the public market to meet the indebtedness. They seemed to prefer that the county should arrange to carry this debt by its notes or contracts, and not by bonds. A vote to incur an indebtedness, and a vote to issue and sell bonds to meet it, are not necessarily the same thing. We

are of opinion that the county was authorized by the vote to incur the indebtedness, but it could not issue and sell bonds on the market, as provided in subsection 9 of the statute (section 4748b). Counsel for appellee cite the case of Maysville & Lexington, etc., Co. v. Wiggins (104 Ky., 540, 20 R.; 724) 47 S. W., 434, as sustaining a contrary doctrine. But the fact is overlooked that that case is discredited on that point, and declared not to be authority, in Whaley v. Commonwealth, *supra.*

The proposition submitted to the turnpike company by the fiscal court, which was in writing, was accepted by the company, but it added certain conditions to its acceptance. The county, by a written order, rejected the conditions. It is now agreed that a proposition can not be accepted conditionally, so as to impose them upon the other party, and that such an acceptance is no acceptance. Admitting this to be so, yet, in this matter when the county rejected the conditions imposed by the company, the latter turned over to the county the possession of the road under the original proposition, which was an abandonment of the condition which it had sought to impose, and left the original proposition accepted, without other conditions than were contained in it.

Section 4732, Ky. St., 1903, provides: "When any turnpike company abandons its road and ceases to charge toll thereon, it shall be the duty of the fiscal court in the county in which any such road lies to take charge and control of same, and keep it in a safe and proper condition for public travel, and alter or discontinue same as other public roads The failure on the part of any turnpike company for the period of four months to keep its road in a condition safe for public travel, and their failure to charge toll thereon for

such length of time, shall be deemed and held to be an aban-
donment within the meaning of this section." After the ex-
ecution of the contract first named, and after the commis-
sioners appointed in the proceeding to condemn appellant's
road as a free turnpike had reported, but before the report
was acted on, the fiscal court decided to abandon the pro-
ceeding under section 15 of the act (section 4748b). It
therefore dismissed the condemnation proceedings in the
county court. It had been more than four months since the
turnpike company had turned over the road to the county,
and had failed to collect tolls on it, and had likewise dur-
ing that time failed to keep the road in repair. Assuming
that the county's contract with the road company was not
binding, and, indeed; had not been accepted, for the reasons
above stated, the fiscal court caused a notice to be served
upon the road company to show cause before that court on
a day named why the fiscal court should not take charge of
the turnpike in question as an abandoned turnpike, under
section 4732 of the Statutes, above quoted. The company
resisted the motion, but the fiscal court adjudged its de-
fense insufficient, and declared and adjudged the road an
abandoned road, and ordered it to be taken in charge and
kept up as a county road. The turnpike company prayed
and was granted an appeal to the circuit court from that judg-
ment, but never prosecuted it. Now the county pleads that
proceeding in bar of this action as an estoppel by judgment.
This seems to be the principal contention made in the brief
for appellee. We are of opinion that the matter is not a
good estoppel. In the first place, there was no abandon-
ment by the turnpike company, in any sense of the word;
and, in the next place, if there was a question about that,
the fiscal court was utterly without jurisdiction to try the

title to the property, or to adjudge an abandonment of forfeiture. The Constitution does not define the jurisdiction of the fiscal courts. But section 1840 of the statutes does. In no event is it authorized to try any litigated question, or to adjudge the rights to property. Its attempted proceeding was a nullity. Its judgment was void.

On the trial of the case a number of witnesses introduced by the county testified that, in their opinion, the road was valueless. On cross examination they gave as their reason for this that tollgate raiders—a species of felons who in the night time went armed and in bands, destroying the tollgates and terrorizing the gates keepers—had by their action made the property so undesirable as a marketable property that it could not be sold. Therefore they thought it had no market value. Again some thought, as the people of the county had voted for free turnpikes, that meant that all toll roads must be relinquished, and that destroyed their future value. Others yet suggested that the effect of these matters, and of the free-turnpike sentiment, took away all market value from the stock of the turnpike companies; that investors would no longer buy it. The only value of that class of evidence was to show that the witnesses giving it were utterly incompetent to judge of the matter about which they were attempting to testify—the actual value of the turnpike road. It was the duty of the county to have protected the gates and property of the road company from the depredations of the marauders. If it failed to do it, and if their strength overcame that of the owners temporarily, that fact should not, and in law does not, detract in the least from the actual value of the properties, in the condemnation proceedings by the county. Nor has the market value of the road anything to do with the

question. There was no market value, and, from the very nature of things, could not be. Under the law, the road company could not sell its road at all, except to the county. There was but one purchaser in existence. Manifestly, then, the criterion of a market value could have no application. Where a commodity or species of property can be sold, and there is a market for it, with opportunity for any number of bidders, and where such sales are made, it is thought that condition affords the best test of value, because, by reason of the competitive bidding in a free and open market, the value so established is most likely to be the actual value of the thing.

Nor did the market value of the stock enter into the question. The stock was not being condemned. The company may have been over capitalized, or may have paid unnecessarily large salaries to useless officers, all of which would have affected the market value of this stock, and yet have had no just effect whatever upon the value of its road. While the value of the road would likely have affected the value of the stock, the market value of the stock could not possibly have affected the actual value of the road, except to show its dividend paying capacity.

The statute governing condemnation proceedings in the county court, as to how the value of the road was to be ascertained, should have been applied in the circuit court. Section 13 of the act regulates that. These are declared to be probative evidence: (1) A view of the road; (2) the books and other evidence showing receipts and expenditures on the part of the road to be sold, and showing net earnings for past six years; and (3) "any other evidence conducing to show the value of the property sought to be taken." The commissioners are then required, from all that evidence, to "award to the owner or owners thereof, the actual value

of the property taken.'" This provision of the statutes speaks of proceedings before the commissioners appointed to find the value of the property to be taken. It must be remembered that in this case, because appellee, Nelson county, wrongfully dismissed its proceedings in the county court, the circuit court, as the only court of general original jurisdiction, is undertaking to carry into effect the original contract between these parties. Besides, that section and provision is the legislative test of value. In the trial of a similar case before a chancellor, without a jury, it was said that it applied. Richmond, etc., T. P. R. Co. v. Madison County Fiscal Court (114 Ky., 351, 24 R., 1260) 70 S. W., 1044.

In this connection it is well to notice the instructions of the court guiding the jury to a verdict upon the value of this property. The instructions given were as follows:

Instruction "r:" "The court instructs the jury that they should find for the plaintiff the actual value, from the evidence, of its road in controversy—being that portion of plaintiff's road between Bardstown and the Spencer county line, including bridges, in the condition in which it was on March 7, 1898—unless they shall believe from the evidence said property was of no value on said date."

Instruction "s:" "By 'actual value' is meant such price or value as could have been obtained at a fair, voluntary sale."

Instruction "t:" "If they believe from the evidence that the property in controversy was of no value March 7, 1898, they should find for the defendant."

Instruction "u:" "The vote in Nelson county November 7, 1897, only authorized said county to obtain the turnpike

road in said county, by gift, lease, purchase or contract, for the purpose of making said road free."

Instruction "M:" "The court instructs the jury that they are not authorized to consider any failure or cessation of plaintiff to collect tolls at its gates, which they may believe from the evidence was caused by the acts of mobs and toll-gate raiders, prior to March 7, 1898, as an abandonment of its road or franchise privileges."

Instruction "F:" "The court instructs the jury that the plaintiff was not required to expend any other portion of its tolls and revenues in the repair and maintenance of its road than was required to keep its road and bridges in a fit condition for public travel, and, if the receipts of the road were more than sufficient to so keep it, it was the duty of plaintiff company to declare dividends, and pay the surplus earnings and profits each year to the stockholders."

There should have been omitted from the first instruction the last sentence—"unless they shall believe from the evidence said property was of no value on said date."

Instruction "s" and instruction "t" should have been omitted; nor do we see any occasion for instruction "u."

It is true, certain witnesses, basing their opinions upon erroneous bases, as had been shown, stated that the road was valueless. But that could not have been so in this case. It was a manifest fact from the record, and one of which the court was bound to take notice, that property of this character and quantity had some value. It had for many years—certainly for the six years previous to its being taken —paid dividends to its stockholders on a basis of six per cent. per annum on the valuation of about $23,000 for the 13 miles of road in suit. The right of way was 60 feet wide. The road was built about 1832. The grade was

20 or 22 feet wide; metal, about 20 feet wide: The road was a macadam. The base was built of limestone rock set on edge, 6 inches deep, making what is known as paving. This was covered or napped with small, broken rock and gravel, 4 to 6 inches deep. The section of country traversed by the road was a rich agricultural community. The road connected the largest city in the State—only about 30 miles distant—with an enterprising and thrifty country town, passing through a number of villages. Two expensive covered wooden bridges, with substantial stone abutments— the bridges about 130 feet long—were a part of the road in this country. The road is a historic one. It was one of the first attempts of the Commonwealth at internal improvements. It was projected and built · before the introduction of steam railroads, and was expected to be an interstate thoroughfare. It cost over $200,000 to build it, of which the State of Kentucky took in stock $100,000. See Collins's History of Kentucky, vol. 1, p. 541. The road was in good condition when taken by the county—a dividend-paying investment to its stockholders. The country it traversed, and the cities it afforded a highway between, had grown considerably, and are yet growing, in population and commercial importance; and the use of the road in the future as a highway must necessarily have been increased, and therefore been more profitable to its owners. To say, or to submit whether, such property was without value, is utterly unjustifiable. The error of the trial court must have been based upon the theory of market value referred to in instruction "s." But even if it had no market value, yet it had a very substantial value to its owner. It is not material, under the Constitution, whether the citizen's property had a market value or not—whether there is such

general demand for it as to create a market—if the State or public need it and propose to take it for public use, they must pay for it; must make the owner whole; must give him in money an equivalent of that value to him, which has been taken for the public. If the thing taken has a market value, then that value is the thing to be restored, for he can go into the market and get the equivalent or what he has been compelled to yield to the public. But if it has not a market value, nevertheless he must be compensated for its actual value to him—in this case to be ascertained in the manner pointed out by the statute. The finding of the jury of $5,000 as the value of this 13 miles of road was flagrantly against the evidence. The court erred in placing the burden of proof. The instructions were erroneous, as indicated. The admission of evidence may be regulated by what has been said.

The judgment is reversed, and cause remanded for a new trial consistent herewith. The judgment of the circuit court should add 6 per cent. per annum from March 7, 1898, to whatever sum is found and adjudged to be the value of the road, for the use of the road under the contract since that date.